UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| TYLER REVELS,<br><br>        Plaintiff,<br><br>    v.<br><br>HOLLY, et al.,<br><br>        Defendants. | Case No. 23-cv-04404-JST<br><br>**ORDER GRANTING MOTION FOR SUMMARY JUDGMENT**<br><br>Re: ECF No. 25 |

Plaintiff has filed a *pro se* civil rights action pursuant to 42 U.S.C. § 1983, alleging that Santa Rita County Jail officials Tichia Holly and Gary Dean White violated his First Amendment right to free exercise of his religion. Now pending before the Court is Defendants' motion for summary judgment. ECF No. 25. Plaintiff has filed an opposition, ECF No. 30, and Defendants have filed a reply, ECF No. 31. For the reasons set forth below, the Court GRANTS Defendants' summary judgment motion.

**DISCUSSION**

**I.    Procedural Background**

Plaintiff commenced this action on or about August 21, 2023. ECF No. 1. The operative complaint is the amended complaint docketed at ECF No. 5. On January 3, 2024, the Court found that the operative complaint's allegation that Deputy White (Inmate Services) and Deputy Holly (video visit tech) denied Plaintiff video visits privileges because Plaintiff was wearing approved religious headgear, a kufi, stated a cognizable claim for violation of Plaintiff's First Amendment right to free exercise of his religion. ECF No. 6. On April 10, 2024, the Court dismissed this action pursuant to Fed. R. Civ. P. 41(b) because Plaintiff had not responded to the Court's March 12, 2024 Order directing him to provide the Court with a current address and the Court had no

address of record for Plaintiff. ECF No. 16. On May 14, 2024, Plaintiff filed a notice of change of address, reporting his current address of record as Federal Correctional Institution – Florence, P.O. Box. 6000, Florence, CO 81226. ECF No. 20. On October 25, 2024, the Court granted Plaintiff's request to reopen this action, and ordered Defendants to file a dispositive motion. ECF No. 23.

## II. Factual Background

The following facts are undisputed unless otherwise indicated.

### A. Relevant Santa Rita Jail Procedures

#### 1. Religious Headwear

For security reasons, incarcerated persons housed at Santa Rita Jail are prohibited from wearing headwear, as headwear may be used to hide weapons or contraband, such as drugs, which can lead to disputes and violence between incarcerated persons, and between incarcerated persons and staff. ECF No. 26-1 ("White Decl."), ¶ 3; ECF No. 25-2 ("Holly Decl."), ¶¶ 5, 7. There are exceptions to this prohibition, including an exception for religious headwear. To qualify for this exception, an incarcerated person must obtain approval from the jail chaplain and jail staff. The general procedure regarding religious headwear approvals is as follows.

First, the incarcerated person submits a request to the jail chaplain for permission to wear religious headwear. If the jail chaplain approves the request, the jail chaplain notifies jail personnel of the approval and records the approval in a database maintained by the chaplain. This database is separate from the ATIMS, the jail management system that records information regarding incarcerated persons, such as when they are detained and released.

Second, the incarcerated person must obtain approval from jail staff to wear the religious headwear. After being informed of the jail chaplain's approval, jail staff review the inmate's status. Jail staff approve the request if there are no indications, e.g. suicide watch, that might make the headwear a safety or security issue. Upon approving the request, jail staff enter the approval into the ATIMS. Jail personnel routinely grant incarcerated persons approval to wear religious headgear if the jail chaplain has granted approval. White Decl., ¶ 4; Holly Decl., ¶ 6; ECF No. 25-5 ("Denoix Decl."), at ¶ 3.

1    Third, jail staff inform the jail chaplain that they have approved the religious headwear request, and the jail chaplain distributes the appropriate headwear, such as a kufi, to the incarcerated person. Sometimes a jail chaplain may anticipate jail staff's approval, such as if the inmate had been approved for the religious headwear during a prior detention, and distribute a kufi prior to obtaining staff approval. Denoix Decl., ¶ 4.

Since 2015, Defendant White has been the deputy responsible for updating ATIMS with religious headwear approvals. The jail chaplain normally sends the email indicating his approval for religious headwear to defendant White. Upon receiving this email, defendant White's normal practice is to approve the religious headwear request and enter the approval into ATIMS. White Decl. ¶¶ 4-5, 8. Defendant White does not recall ever intentionally denying approval to wear religious headgear if the chaplain has already approved the request. White Decl. ¶ 5.

### 2. Video Visits

Since approximately November 2022, persons incarcerated at Santa Rita Jail can have video visits using the "Getting Out" app on their jail-issued tablets. To conduct a video visit, the incarcerated person must be in the common or "pod" area of their housing unit and must attach their jail-issued tablet to a chip in the wall of the pod area. To conduct an audio-only visit, incarcerated persons may either use the "Getting Out" app or the wired telephones present in each of the housing pods. Holly Decl. ¶¶ 3, 4. The jail prohibition on headgear applies during video visits.

All video visits are monitored by jail staff. Since November 2022, defendant Holly has been one of the jail staff monitoring incarcerated persons' video visits with non-attorneys. Defendant Holly typically simultaneously monitors several ongoing video visits, sometimes over twenty visits. Holly Decl. ¶¶ 2, 3. Defendant Holly makes an effort to regularly remind incarcerated persons of the rules that are commonly violated during video visits, such as the rules that all video call participants be fully dressed and that incarcerated persons may not wear headwear. Deputy Holly further reminds incarcerated persons that violation of the rules will lead to termination of the video visit. Upon receiving a warning, incarcerated persons must acknowledge the warning in order to do a video visit. When defendant Holly is monitoring a

3

video call and notices a rule violation, her normal practice is to give incarcerated persons a warning of the violation and allow the incarcerated person an opportunity to correct the violation. If the violation is corrected or defendant Holly learns that the incarcerated person has approval to wear headwear, defendant Holly re-initiates the call. Holly Decl. ¶¶ 7, 8. During the relevant time period, defendant Holly could not communicate with incarcerated persons directly through the Getting Out app. If she needed to convey a warning or a rule violation, she would call the incarcerated person's housing unit and speak to the housing unit deputy, and have the housing unit deputy convey the warning to the incarcerated person. With respect to the headwear rule, after receiving a warning, an incarcerated person typically either removes the headwear for the remainder of the video visit or, if he claims he has approval, he provides the housing unit deputy with proof of the approval. The incarcerated person may also contact the chaplain, or take other action to correct the record. If an incarcerated person reinstates the call yet continues to wear the unapproved headwear without providing proof of approval, defendant Holly cuts off the video visit and suspends the incarcerated person's ability to have video visits for 24 hours or until the incarcerated person provides proof of approval. Holly Decl. ¶¶ 8. Defendant Holly's normal practice when she begins her weekly shift is to look up in ATIMS who has approval to wear headwear, and create a list of names and photos of persons with such approval. That way, when defendant Holly is monitoring video visits, she can quickly check whether anyone she sees wearing headgear has approval to do so. In her years of experience, the list of headwear approvals in ATIMS is kept up to date and is correct 98% of the time. Holly Decl. ¶ 10.

Jail staff cannot issue refunds for video visits. Incarcerated persons must obtain refunds from the video visit provider, ViaPath Technologies. ECF No. 25-4 at 21.

**B.     Relevant Events**

Plaintiff has previously been detained at Santa Rita Jail. ECF No. 25-4 at 2. During two of these prior detentions – once in 2022 and once in early 2023 – Plaintiff received approval from both the chaplain and defendant White to wear a kufi. Both times, defendant White entered the approval into ATIMS. White Decl. ¶ 4, 7, 9; Denoix Decl., Ex. B; ECF No. 25-4 at 2. Defendant White has never denied Plaintiff approval to wear religious headgear. White Decl. ¶ 5.

4

1    The relevant events took place during Plaintiff's May 17, 2023 to July 26, 2023 detention at Santa Rita Jail. Rudolph Decl., ¶ 5. When Plaintiff was booked in Santa Rita Jail for this detention, he was not photographed with his kufi on. ECF No. 30 at 7-8.

On or about June 5, 2023, Plaintiff received approval from the jail chaplain to wear a kufi, a religious head covering, and was distributed a kufi. Denoix Decl., ¶¶ 3-5 and Ex. B. Defendant White was informed of the approval,[1] but failed to update ATIMS with the approval.

Defendant White states that the failure to update ATIMS with the June 5, 2023 approval was entirely accidental. Defendant White states that he did not purposely fail to enter Plaintiff's headwear approval into ATIMS; that he did not want or intend to discriminate against, or punish, Plaintiff for his religious beliefs; and that, to the best of his knowledge, he has never failed to enter an approval for Plaintiff to wear a kufi, except on this particular occasion. White Decl. ¶ 5-12. Defendant White further states that he was not seeking a promotion during the relevant time period; that the most recent promotional period had closed in November 2022, six months prior to the relevant events; and that he had not applied for that promotion. ECF No. 31-1 at 2.

Plaintiff alleges that defendant White intentionally failed to enter the approval into ATIMS. In support of this claim, Plaintiff argues the following. Plaintiff had previously filed grievances against defendant White, which Plaintiff has heard can affect an officer's chance for promotion. Defendant White's failure to update ATIMS was in retaliation for these grievances. It is unlikely that the failure was accidental because (1) jail staff failed to ensure that Plaintiff was wearing a kufi for his booking photo, which would have indicated that Plaintiff is Muslim; (2) defendant White denied Plaintiff's grievances regarding the cancelled video visits; (3) jail staff failed to reimburse Plaintiff for the cancelled video visits; (4) defendant White was aware that not updating ATIMS would burden Plaintiff's religious practices; and (5) defendants White and Holly

---

[1] Defendants do not dispute that the chaplain sent defendant White an email advising that an approval had been issued. In preparing this dispositive motion, defendant White searched his emails for an email from the chaplain between June 5 and July 2, 2023, but was unable to find any such email. Defendant White believes that an email may have arrived and that he erroneously deleted it, either because he mistakenly believed that he already entered the approval into ATIMS, or because he mistakenly believed that the approval was already in ATIMS because he had previously entered such approvals for Plaintiff earlier in 2023 and in 2022. White Decl. ¶ 9.

were aware that during Plaintiff's prior incarcerations, his video visits had been shut off due to Plaintiff wearing a kufi. *See generally* ECF No. 30.

On June 30, 2023, Plaintiff's video visit was cut short because he was wearing a kufi. ECF No. 25-3 at 5. Defendant Holly was not working on that day and had no involvement in the decision to terminate the video visit. Holly Decl. ¶ 9. Plaintiff filed Grievance No. 260622291, stating that that his religious rights as a Muslim were violated when his video visit was terminated that day due to his wearing a religious item, his kufi. ECF No. 25-3 at 5.

On July 2, 2023, as defendant Holly was monitoring approximately fifteen video visits, she noticed that Plaintiff was wearing a kufi during his video visit. Defendant Holly checked her list of incarcerated persons approved to wear headwear, and did not see Plaintiff's name on the list. Defendant Holly contacted Plaintiff's housing unit deputy by phone and asked him to tell Plaintiff that he needed to remove the kufi in order to continue the video visit. Defendant Holly then shut off the video visit. Shortly thereafter, Plaintiff reinitiated the video call, with his kufi still on. Because defendant Holly had not received any response to her warning and had not been made aware that Plaintiff had approval to wear the kufi, defendant Holly shut off the video visit and initiated a temporary 24 hour suspension of Plaintiff's video visit privileges. Plaintiff was able to make audio-only calls using the wired telephones in the pods. Holly Decl. ¶ 11; ECF No. 25-3 at 10. Defendant Holly states that she did not personally know Plaintiff, did not recall having met him before, and was not aware that he was Muslim. Holly Decl. ¶ 11. The July 2, 2023 video visit lasted 44 seconds, and Plaintiff was not charged for this video visit. ECF No. 25-3 at 10, 14, 17.

On July 4, 2023, as defendant Holly was monitoring approximately twelve video visits, she noticed that Plaintiff was again wearing a kufi during his video visit. Because prison records did not indicate that Plaintiff had approval to wear the kufi, defendant Holly issued a warning regarding what she believed to be unauthorized headwear and shut off the video visit. Plaintiff reinitiated the video call, with his kufi still on. Because defendant Holly believed that Plaintiff was not authorized to wear the kufi, defendant Holly shut off the video visit and initiated another temporary 24 hour suspension of Plaintiff's video visit privileges. Plaintiff was able to make

6

audio-only calls using the wired telephones in the pods. Holly Decl. ¶ 12; ECF No. 25-3 at 11. The July 4, 2023 video visit lasted 2 minutes and 18 seconds, and Plaintiff was charged $2.00. ECF No. 25-3 at 11, 14, 17.

Defendant Holly shut off Plaintiff's video visits on July 2 and 4, 2023, because, based on her review of prison records, she believed that Plaintiff was not authorized to wear his kufi. Defendant Holly did not shut off Plaintiff's video visits because she disagreed with, disapproved of, or wanted to punish Plaintiff for, his religious beliefs. Holly Decl. ¶¶ 13, 14.

Plaintiff disputes defendant Holly's claims that she shut off his video visits on July 2 and 4 because he was wearing unapproved headgear; that she was unaware that Plaintiff was Muslim, and that she contacted Plaintiff's housing unit deputy and asked the deputy to ask Plaintiff to remove his kufi. Plaintiff alleges that defendant Holly shut off the video visit because she does not support Palestinians, and there was a Palestine flag in the background of his visitor's screen and defendant Holly mistook Plaintiff's kufi for a durag. Plaintiff states that defendant Holly knew him from his prior incarcerations and knew that he is a practicing Muslim, having observed him attend Jumu'ah. Plaintiff also challenges defendant Holly's credibility, stating that she has not provided documentation that she spoke to his housing unit deputy and alleging that he was never asked to remove his kufi in order to continue with his video visit. *See* ECF No. 30 at 9.

On July 5, 2023, Plaintiff's video visit was cut short because he was wearing a kufi. ECF No. 25-3 at 5. Defendant Holly was not working that day and had no involvement in the decision to terminate the video visit. Holly Decl. ¶ 9; ECF No. 25-3 at 11. The July 5, 2023 video visit lasted 1 minute, and Plaintiff was charged $0.50. ECF No. 25-3 at 12, 14, 17. Later that day, defendant White received an email from Sheriff Murphy stating that Plaintiff's approval to wear his kufi was not reflected in ATIMS and that Plaintiff's video visits were being shut off as a result. White Decl. ¶ 11 and Ex. F. That same day, defendant White updated ATIMS to reflect that Plaintiff was approved to wear religious headwear. White Decl. ¶ 11.

**C.   Grievances**

On June 30, 2023, Plaintiff filed Grievance No. 260622291, stating that that his religious rights as a Muslim were violated when his video visit was terminated that day due to his wearing a

7

1 religious item, his kufi. ECF No. 25-3 at 5.

2     On July 3, 2023, Plaintiff received the following response to Grievance No. 260622291:

3     The Video Visiting Unit was contacted regarding this grievance. At this time, the Video Visiting Unit is actively working on obtaining a roster of inmates who have religious exemption to wear approved religious headgear. The Grievance Unit is unable to assist with this matter any further. Please direct all future questions and concerns to the Video Visiting Unit.

6 ECF No. 25-3 at 5.

7 **III.   Summary Judgment Standard**

8     Summary judgment is proper where the pleadings, discovery and affidavits show there is "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *See* Fed. R. Civ. P. 56(a) (2014). Material facts are those that may affect the outcome of the case. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute as to a material fact is genuine if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. *See id.*

    A court shall grant summary judgment "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial [,] . . . since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986). The moving party bears the initial burden of identifying those portions of the record that demonstrate the absence of a genuine issue of material fact. *Id.* The burden then shifts to the nonmoving party to "go beyond the pleadings and by [his] own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" *See id.* at 324 (citing Fed. R. Civ. P. 56(e)). "A scintilla of evidence or evidence that is merely colorable or not significantly probative does not present a genuine issue of material fact" precluding summary judgment." *Addisu v. Fred Meyer, Inc.*, 198 F.3d 1130, 1134 (9th Cir. 2000).

    For purposes of summary judgment, the court must view the evidence in the light most favorable to the non-moving party, drawing all justifiable inferences in that party's favor. *AXIS Reinsurance Co. v. Northrop Grumman Corp.*, 975 F.3d 840, 844 (9th Cir. 2020). If, as to any

8

1  given material fact, evidence produced by the moving party conflicts with evidence produced by
2  the nonmoving party, the Court must assume the truth of the evidence set forth by the nonmoving
3  party with respect to that material fact. *Furnace v. Sullivan*, 705 F.3d 1021, 1026 (9th Cir. 2013).
4  However, facts must be viewed in the light most favorable to the nonmoving party only if there is
5  a "genuine" dispute as to those facts. *Scott v. Harris*, 550 U.S. 372, 380 (2007). The court's
6  function on a summary judgment motion is not to make credibility determinations or weigh
7  conflicting evidence. *Manley v. Rowley*, 847 F.3d 705, 711 (9th Cir. 2017).

### IV.     Legal Standard for First Amendment Free Exercise Violation

Prisoners "do not forfeit all constitutional protections by reason of their conviction and confinement in prison." *Bell v. Wolfish*, 441 U.S. 520, 545 (1979). Prisoners retain the protections afforded by the First Amendment, "including its directive that no law shall prohibit the free exercise of religion." *O'Lone v. Estate of Shabazz*, 482 U.S. 342, 348 (1987). However, "'[l]awful incarceration brings about the necessary withdrawal or limitation of many privileges and rights, a retraction justified by the considerations underlying our penal system.'" *Id.* (quoting *Price v. Johnston*, 334 U.S. 266, 285 (1948)). Due to the mere fact of incarceration, a prisoner's First Amendment rights are necessarily "more limited in scope than the constitutional rights held by individuals in society at large." *Shaw v. Murphy*, 532 U.S. 223, 229 (2001). Consequently, an inmate retains only "those First Amendment rights that are not inconsistent with his status as a prisoner or with the legitimate penological objectives of the corrections system." *Pell v. Procunier*, 417 U.S. 817, 822 (1974). Similar principles apply with respect to pretrial detainees. *See Bell*, 441 U.S. at 545 (pretrial detainees retain "at least" the same constitutional rights as convicted prisoners, including "freedom of . . . religion under the First and Fourteenth Amendments") (citations omitted); *Pierce v. Cnty. of Orange*, 526 F.3d 1190, 1209 (9th Cir. 2008) ("as with other First Amendment rights in the inmate context, detainees' rights may be limited or retracted if required to 'maintain [ ] institutional security and preserv[e] internal order and discipline'") (internal quotation marks and citation omitted; alterations in original).

To prevail on a First Amendment free exercise claim, a pretrial detainee essentially must prove that a government official (a) "substantially burden[ed]" the pretrial detainee's exercise of a

9

1  sincerely held religious belief; and (b) did so in an unreasonable manner—i.e., the official's
2  actions were not "rationally related to legitimate [governmental] interests." *See O'Lone*, 482 U.S.
3  at 348–50.  "A substantial burden . . . place[s] more than an inconvenience on religious exercise; it
4  must have a tendency to coerce individuals into acting contrary to their religious beliefs or exert
5  substantial pressure on an adherent to modify his behavior and to violate his beliefs." *Jones v.*
6  *Williams*, 791 F.3d 1023, 1031–32 (9th Cir. 2015) (alteration in original, internal quotation marks
7  and citations omitted).  Whether a prison official's restriction on a religious practice is a
8  reasonable, rather than an "exaggerated," response to a legitimate governmental interest, courts
9  consider four factors, specifically: (1) whether there is a "valid, rational connection" between the
10 regulation and a legitimate government interest put forward to justify it; (2) "whether there are
11 alternative means of exercising the right that remain open to prison inmates;" (3) whether
12 accommodation of the asserted constitutional right would have a significant impact on guards and
13 other inmates; and (4) whether ready alternatives are absent (bearing on the reasonableness of the
14 regulation). *Turner v. Safley*, 482 U.S. 78, 89–90 (1987).  Further, when the restriction affects pre-
15 trial detainees, substantive due process requires that the restriction or regulation cannot be
16 intended to serve a punitive interest.  *Bell*, 441 U.S. at 535.

**V.  Analysis**

The following facts are undisputed.

Jail policy prohibits incarcerated persons from wearing headwear for security reasons, as headwear may be used to hide weapons or contraband.  There is an exception for religious headwear, but the exception must be approved by the jail chaplain and jail staff.  Approvals are entered into ATIMS, and jail staff monitoring video visits rely on ATIMS to determine which incarcerated persons are approved to wear religious headwear.  Even if a video visit is cancelled, the incarcerated person retains the ability to communicate with visitors by making audio-only calls using the wired telephones in the pods.

On June 5, 2023, the jail chaplain approved Plaintiff to wear a kufi and distributed a kufi to him.  ECF No. 25-5.  The approval from the jail chaplain was recorded in a database maintained by the chaplain.  The jail chaplain informed defendant White of the approval via email.  Defendant

10

White did not enter this approval into ATIMS.  On June 30, and July 2, 4, and 5, Plaintiff's video visits were cut short because Plaintiff was wearing his kufi and jail officials monitoring the video visits relied incorrectly on the ATIMS to conclude that Plaintiff was wearing headwear without authorization.  Defendant Holly was the jail official monitoring the July 2 and 4 video visits.  Defendant Holly was not working on June 30 or July 5, and had no involvement in the decision to end Plaintiff's video visits on those days.  On July 5, defendant White was informed that Plaintiff's approval to wear religious headwear had not been entered into ATIMS, causing his video visits to be cut short.  Defendant White updated ATIMS that same day.

The Court GRANTS summary judgment in favor of Defendants.  Plaintiff has not demonstrated a triable issue of fact as to whether Defendants substantially burdened his religious practice.  Here, the record shows that, (1) due to defendant White's failure to update ATIMIS to reflect the jail approval for Plaintiff to wear religious headwear, Plaintiff missed four video visits over a six-day period; and (2) defendant Holly had no involvement in two of the video visit cancellations.  The deprivation of the video visits were the sort of "relatively short-term" intrusions that do not amount to a substantial burden on the prisoner's First Amendment free exercise rights.  *See Canell v. Lightner*, 143 F.3d 1210, 1215 (9th Cir. 1998) (affirming summary judgment on claim that defendant violated Free Exercise Clause by interrupting inmate's prayer time no more than 18 times over two months because it was "relatively short-term and sporadic," and not a "substantial burden"); *see also Hammler v. Hernandez*, No. 1:19-CV-00616 SKO (PC), 2024 WL 4133910, at *6 (E.D. Cal. Sept. 10, 2024) (relatively short-term and sporadic intrusions on religious practice did not constitute substantial burden) (collecting cases).  While the cancellation of the four video visits inconvenienced Plaintiff, the cancellation did not "have a tendency to coerce [Plaintiff] into acting contrary to [his] religious beliefs or exert substantial pressure on [him] to modify his behavior and to violate his beliefs." *Jones*, 791 F.3d at 1031–32.  The record also shows that after Plaintiff spoke with Deputy Sheriff Tuttle on July 4, 2025 about improperly being denied video visits for wearing a kufi, Sheriff Tuttle promptly contacted jail staff to request a resolution; and that after this email was forwarded to defendant White on July 5, 2025, defendant White promptly updated ATIMS and Plaintiff was able to conduct video visits after that

11

1  date.

2  Plaintiff's allegations that defendant White deliberately failed to enter the kufi approval
3  into ATIMS and that defendant Holly knew that the ATIMS's failure to reflect the kufi approval
4  was inaccurate are speculative and conclusory.  More relevantly, they do not establish that the
5  cancellation of four video visits over a six-day period substantially burdened Plaintiff's First
6  Amendment right to freely practice his religion.

## CONCLUSION

For the reasons set forth above, the Court GRANTS Defendants' motion for summary judgment.  ECF No. 25.  Judgment is entered in favor of Defendants and against Plaintiff.  The Clerk shall terminate any pending motions as moot and close the case.

**IT IS SO ORDERED.**

Dated:  September 29, 2025



_____
JON S. TIGAR
United States District Judge